UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| IN RE:<br><br>APPLIED MACHINERY RENTALS, LLC,<br><br>_____ Debtor _____ | CASE NO.: 23-30461<br>CHAPTER 7 |
| COLE HAYES, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF APPLIED MACHINERY RENTALS, LLC,<br>Plaintiff,<br><br>v.<br><br>GATEWAY ACCOUNTING, INC. DBA CENTERPOINT CFO, CENTERPOINT CFO, LLC, AND PAUL PERIALAS,<br>Defendants. | ADVERSARY PROCEEDING NO.: 25-03076 |

## FIRST AMENDED COMPLAINT

Now comes Cole Hayes, through counsel, as the Chapter 7 Trustee for the Bankruptcy Estate of Applied Machinery Rentals, LLC ("AMR" or "Debtor") and shows the Court:

### Preliminary Statement

The Trustee files this adversary proceeding against Defendants, the business advisory firm that provided and was paid for certified financial officer ("CFO") services to the Debtor prior to its bankruptcy filing. Before the Debtor's bankruptcy filing, Garth Errol McGillewie Jr. ("Garth"), who controlled the Debtor, systematically looted the company by diverting corporate assets for personal use and benefit, thereby rendering the company insolvent and causing substantial harm to the Debtor's creditors.

While Garth was engaged in misconduct and criminal behavior, Defendants were engaged to provide professional CFO services to the Debtor, including the preparation of or assistance with the preparation of financial statements, tax returns, auditing, and other accounting work for the Debtor. Defendants either negligently failed to detect the magnitude of Garth's misconduct despite clear red flags, or worse, detected the improprieties but failed to alert other officers of the company, the Debtor's lenders, or appropriate authorities. Centerpoint and Perialas each had a professional obligation to exercise reasonable care in providing CFO, financial, and operational services and to report significant irregularities or suspected fraud to appropriate parties within the Debtor's organization. Had Centerpoint and Perialas properly fulfilled their professional obligations, Garth's misconduct would have been detected and stopped much earlier, preventing substantial losses to the Debtor and its creditors. The Trustee brings this action to recover damages sustained by the Debtor and its estate as a result of CenterPoint's and Perialas's professional negligence, breach of contract, aiding and abetting breaches of fiduciary duty, and other wrongful conduct.

### Parties, Jurisdiction, and Venue

1. Plaintiff is the duly appointed, acting, and qualified Chapter 7 Trustee for the bankruptcy estate of Applied Machinery Rentals, LLC.

2. Applied Machinery Rentals, LLC is the debtor in the bankruptcy case bearing Case Number 23-30461 ("Bankruptcy Case"), filed on July 17, 2023 ("Petition Date"), and pending in the United States Bankruptcy Court for the Western District of North Carolina ("Court").

3. Defendant Gateway Accounting, Inc. is a corporation organized and operating in the State of North Carolina and with a principal place of business in Mooresville, Iredell County, North Carolina. Gateway Accounting, Inc. did business as Centerpoint CFO before November 14, 2023.

4. Defendant Centerpoint CFO, LLC ("Centerpoint") is a limited liability company formerly organized and operating in the State of North Carolina and with a principal place of business in Mooresville, Iredell County, North Carolina.

5. In this Complaint, Gateway Accounting, Inc., Centerpoint, and Centerpoint CFO are used interchangeably.

6. Defendant Paul Perialas is a former employee of Centerpoint CFO or maintained an independent contractor relationship with Centerpoint CFO, and, Upon information and belief, Perialas is a resident of Mecklenburg County, North Carolina.

7. Perialas is a seasoned Fractional CFO with over 30 years of expertise as a financial and operational business partner in a wide variety of business environments.

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334.

9. This matter is a core proceeding pursuant to 28 U.S.C. § 157.

10. In accordance with Rule 7008 of the Rules of Bankruptcy Procedure, Plaintiff consents to entry of final judgments and orders by the Bankruptcy Court.

11. Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1409(a).

12. The statutory predicates for relief are 11 U.S.C. §§ 105, 544, 547, 548, 550, and 551, as well as N.C. Gen. Stat. § 39-23.1 *et seq.*, and S.C. Code §§ 39-5-10, *et seq.*

13. Plaintiff commences this action under Rule 7001 of the Federal Rules of Bankruptcy Procedure.

14. Before bankruptcy, Debtor maintained its operations in Rock Hill, South Carolina.

15. Before bankruptcy, Garth resided in Waxhaw, Union County, North Carolina.

3

16.     Since its formation, Garth was the sole member, manager, and principal of the Debtor.  Garth acted as president and CEO of the Debtor.

17.     After Garth, AMR's next senior officer was its vice-president, Jessica King.

## Factual Background

18.     AMR purported to be in the business of acquiring, distributing, leasing, and selling Merlo Telehandlers – an Italian hydraulic machine that is a combination tractor, forklift, and crane boom.  AMR was previously the exclusive dealer of Merlo equipment in North America.

19.     Since its formation, Garth was the sole member, manager, and principal of AMR.  Upon information and belief, Garth acted as president and CEO of AMR and exercised complete and unfettered dominion and control over its affairs and assets.

20.     AMR's entire business model was based on fraud and illegal activity.  Although AMR had a modest operation where it sold an occasional telehandler, parts, and did repair and warranty work, AMR had negligible legitimate rental income – an oddity for a company with "Rentals" in its name.

21.     The "big money" that flowed in and out of AMR's bank accounts was orchestrated by Garth.  Garth maintained an off-book portfolio for "friends and family" from which he ran the AMR Ponzi Scheme.

22.     Stephanie Hofinga was the accountant at AMR from May 2021 to November 2022.  On June 9, 2025, Ms. Hofinga testified that Garth had sole access to AMR's bank accounts and moved money between accounts constantly.  Ms. Hofinga also testified that AMR's books were in complete disarray when she was hired, that Garth controlled all information about AMR's actual sales and leases, and getting information from him was difficult to impossible.

23.     In 2022, Ms. Hofinga communicated extensively with Ms. Kim Smith of Burkett, Burkett & Burkett, Certified Public Accountants, P.A. in connection with an audit of AMR's books.  Ms. Hofinga was asked in an email about

"difficult accounts to decipher." Ms. Hofinga asked Garth about this and Garth said he entered into loans or investments or deals between business friends, separate from AMR's operations, and that did not involve the sale of telehandlers. Ms. Hofinga testified that those deals were part of Garth's separate portfolio and she was provided little to no information on them.

24.     Ms. Hofinga also testified that Garth engaged in innumerable transactions where AMR purportedly sold a telehandler (often fake) to a friend of Garth, which was recorded as a sale in QuickBooks, then repurchased the same telehandler shortly thereafter and paid the friend a 10% fee to reacquire the equipment.

25.     Ms. Hofinga testified that she struggled to account for these "transactions between 'friends'" accurately in QuickBooks, ultimately giving up and leaving AMR after being chastised by Garth for creating a spreadsheet of questionable transactions and sharing it with the Burkett CPA firm.

26.     Garth ran the enterprise with the intent to enrich himself and his family at the expense of AMR's creditors and, to that end, committed numerous criminal acts in furtherance of the enterprise.

27.     Indeed, Garth used AMR to operate a Ponzi scheme from at least 2019 until he took his life in 2023.[1] He borrowed money from various creditors on

---

[1] A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. Cunningham v. Brown, 265 U.S. 1 (1924). In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme. See Bear Stearns Servs. Corp. v. Gredd, 397 B.R. 1, 8-10 (S.D.N.Y. 2007) (citing Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n.3 (2d Cir. 1995)); see also In re: Unified Commercial Capital Inc., 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ("A Ponzi scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly-attracted investments. Typically, investors are promised larger returns for their investments. Initial investors are actually paid the promised returns, which attracts additional investors."). There is a general rule - known as the "Ponzi scheme presumption" - that such a scheme demonstrates fraudulent intent as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." Gredd, 387 B.R. at 8-10; see e.g., Donnell v. Kowell, 533 F.2d 462, 770 (9th Cir. 2008); Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006); SEC v. Resource Dev. Int'l, LLC, 487 F.3d 295, 304 (5th Cir. 2007); Armstrong v. Collins, 2010 U.S. Dist. LEXIS 28075, at *63 (S.D.N.Y. 2010).

false pretenses and used loan proceeds from some creditors and investments from new investors to pay previous investors, keep creditors at bay, and hide his fraud.

28.    Garth also obtained loans to finance the import and purchase of Merlo Telehandlers.  He represented and made assurances to lenders that AMR would purchase and then lease telehandlers to customers and use the lease payments to repay the loans.  In reality, AMR had virtually no leasing operation.

29.    Garth also pledged telehandlers that did not exist and pledged the same telehandlers to multiple lenders representing that each lender had a first-priority lien.

30.    Garth also sold the telehandlers "out of trust" to third parties without the lenders' knowledge or consent, and without remitting the sale proceeds to the lenders.

31.    AMR also entered into several inventory finance agreements with lenders so that potential purchasers could finance the purchase of telehandlers from AMR.  On at least two occasions involving Barry Equipment, Inc. and Reeman Farm Equipment, AMR submitted fake invoices to the inventory finance lender.  In those instances, the lender paid AMR for the purported sale of the telehandler, but the purchaser had no knowledge of the transaction, had not purchased a telehandler, had not authorized the invoice, and did not receive a telehandler.

32.    A core component of Garth's Ponzi scheme included inducing creditors to purchase telehandlers (that usually did not exist) at well below fair market value and then, without ever taking possession, lease the telehandlers back to AMR purportedly to be leased to other parties.  This scheme allowed Garth to receive and return investments without having to physically deliver any equipment. These arrangements were a sham that permitted investors in the AMR Ponzi Scheme to be paid handsome returns.

33.    In a variation on this maneuver, Garth exchanged fake invoices with investors where on paper it appeared AMR was selling telehandlers.  But in reality, the invoices were a façade for an investment and a promised return – often

10% in 60-90 days.  AMR paid the investment by "buying back" the telehandlers it sold at the 10% or greater markup.  In most cases, the telehandlers never existed and in all cases they were never physically delivered or returned.

34.     This fiction allowed Garth to create the appearance of solvency and profitability for AMR even though AMR never possessed anywhere near the number of telehandlers or achieved the profitability that Garth represented to AMR's creditors.

35.     AMR's balance sheet listed millions in sales and receivables based on fake sales.  The telehandlers either did not exist or they never changed hands and the buyers had to be paid back at a premium, making a receivable actually a liability.

36.     AMR was insolvent as of year-end 2019, 2020, 2021, and 2022, and became more indebted as time passed.  For the period ending December 31, 2019, the Debtor's liabilities exceeded its assets by over $26 million.  For the period ending December 31, 2020, the Debtor's liabilities exceeded its assets by over $61 million. For the period ending December 31, 2021, the Debtor's liabilities exceeded its assets by over $78 million.  For the period ending December 31, 2022, the Debtor's liabilities exceeded its assets by over $123 million. AMR also did business as Applied Machinery Sales ("AMS").

37.     Garth would generate fake invoices from AMS to the Debtor that showed a sale of inventory from AMS to the Debtor.  This transaction constituted nothing more than the Debtor selling inventory to the Debtor.  Yet, lenders/investors would be deceived into using the phony invoice as a basis to loan funds and take a purchase money security interest in the "sold" inventory.  The loaned funds would be used to keep the AMR Ponzi scheme from being discovered or collapsing.

38.     With at least one lender – Security Bank & Trust Company – Garth used 1800 W. Reelfoot Ave., Union City, TN 38261 as AMR's address.  The Debtor never had operations in Tennessee but Garth did this so Security Bank would think that AMR and AMS were different entities.

39.     In late 2021 and into 2022, Garth also began to use Stateline Rentals, LLC ("Stateline") – a dormant limited liability company he formed in 2016 – to further the AMR Ponzi Scheme.  Stateline had the same "business" address as AMR.  It conducted no independent business and owned no property.  It had no employees.  It was a mere alter ego of AMR and an instrumentality for Garth to fraudulently obtain funds to further the AMR Ponzi Scheme.

40.     AMR's facility in Rock Hill, South Carolina contained nothing to indicate that Stateline was a real business, such as signage, letterhead, business cards, employee records, marketing materials, or invoices.

41.     Wendy McGillewie, Garth's widow, was listed as an officer of Stateline and was also its registered agent.  She has denied having any knowledge of Stateline.

42.     AMR funds were hidden in Stateline's bank accounts to prevent creditors from seizing funds from AMR.

43.     Garth falsely represented to various lenders that Stateline was a legitimate, independent business that would purchase Merlo equipment from AMR through market-rate, arms'-length transactions and then lease that equipment to customers.

44.     These representations were false but Garth succeeded in getting several lenders to enter into loan and lease transactions with Stateline.

45.     For example, on March 3, 2021, Bank of the West entered into an Inventory Financing and Security Agreement with Stateline for over $2.8 million.

46.     On December 20, 2021, BOKF, NA dba Bank of Texas entered into a Dealer Security Agreement and Loan with Stateline Rentals, LLC for $7,000,000.00.

47.     On March 17, 2022, Mitsubishi HC Capital America entered into a Master Installment Payment Agreement and Schedules with Stateline for over $2.6 million.

48.   On May 12, 2022, Stearns Bank entered into an Equipment Finance Agreement with Stateline for $2,266,990.56.

49.   On June 1, 2022, Stearns Bank entered into a second Equipment Finance Agreement with Stateline for $2,586,093.12.

50.   Garth immediately diverted the lion's share of the funds to individuals and entities that were part of the "friends and family" group that participated in the AMR Ponzi Scheme.  Garth also diverted the funds for personal, non-debtor expenses.

51.   The lenders entered into these transactions intending the obligations to be secured by Merlo equipment.  Ultimately, Stateline defaulted on all these obligations and the lenders have discovered that they are unsecured because the Merlo equipment either never existed, had been sold, or had been previously pledged to other lenders.

52.   BMO Harris Bank f/k/a Bank of the West filed a proof of claim for $3,053,112.70 (Claim 84-2), BOKF, NA dba Bank of Texas filed a proof of claim for $4,778,688.04 (Claim 111), Mitsubishi HC Capital America filed a proof of claim for $2,626,254.00 (Claim 31), and Stearns Bank filed a proof of claim for $3,822,591.93 (Claim 57).

53.   Garth used Debtor funds to pay early investors like Brian Smith and Bruce Hum of Pure Profit, LLC, among others, in full with above-market-rate profits.

54.   Garth also used funds to buy vehicles, boats, and homes for himself and his family.  For example, he purchased the following luxury vehicles from McLaren of Charlotte:

| *Date* | *Make/Model - Purchased* | *Make/Model - Trade-In* | *Sale Price* | *Amount Financed* |
|--------|--------------------------|-------------------------|--------------|-------------------|
| 2019.08.07 | *Unavailable* | 2019 McLaren 720S Coupe | *Unavailable* | *Unavailable* |
| 2020.06.30 | 2020 McLaren 720S Coupe | 2019 McLaren 720S Coupe | $346,010.00 | $362,995.00 |

| Date | Make/Model - Purchased | Make/Model - Trade-In | Sale Price | Amount Financed |
|------|------------------------|------------------------|------------|-----------------|
| 2020.08.11 | 2020 Land Rover Ranger Rover Wagon | 2019 Land Rover Range Rover | $67,679.55 | $67,382.05 |
| 2020.10.27 | 2020 Lamborghini Urus | 2020 Lamborghini Urus | $255,496.00 | $235,569.18 |
| 2021.01.18 | 2021 McLaren 765LT Coupe | 2020 McLaren 720S | $442,500.00 | $384,079.75 |
| 2021.02.01 | 2021 Lamborghini Urus | 2020 Lamborghini Urus | $270,500.00 | $243,649.67 |
| 2021.05.12 | 2021 Lamborghini Urus | 2021 Lamborghini Usus | $299,900.00 | $235,993.32 |
| 2021.09.11 | 2021 Lamborghini Urus | 2021 Lamborghini Usus & BMW M760 XI | $332,500.00 | $250,000.00 |
| 2022.03.24 | 2022 Lamborghini Urus | 2021 Lamborghini Urus | $400,500.00 | $276,555.48 |
| 2022.06.16 | 2020 Land Rover Ranger Rover Wagon | *n/a* | $95,500.00 | $57,079.75 |
| 2022.08.25 | 2022 Lamborghini Urus | 2022 Lamborghini Urus | $372,000.00 | $292,517.46 |
| 2023.01.23 | 2023 Cadillac Escalade SUV | *n/a* | $216,500.00 | $0.00 |

55.    Garth also purchased a 2022 Bentley Bentayga ($275,000), 2023 Bentley Flying Spur ($400,000), 2021 BMW X5, and a 2021 Porsche 911 Turbo S and made payments on them with AMR funds.

56.    In addition to these vehicles, at the time of his death, Garth owned several boats, purchased or paid for with AMR funds and used by him and his sons. These include a 2022 39.3' marine vessel bearing vehicle identification number 1183125 and hull identification number FGQ8C155B606, a 2016 42' marine vessel bearing vehicle identification number 1275144 and hull identification number YFY42105J617, a 2006 37.9' marine vessel bearing vehicle identification number 1323750 and hull identification number GQL39687E122, and, through Garth's entity G and W Holding Company, LLC, a 64.5' Weaver fishing yacht bearing vehicle identification number 1333170 and hull identification number WSF64044C323.

57.    The purchase price for the Weaver alone was $3,370,100.00.

58.    Garth financed $2.4 million of the purchase price, used AMR funds to pay the balance, and used AMR funds to pay the finance note.

59.    In 2018, Garth and his wife purchased an 8,100 square foot mansion with a 6 ½ car garage at 8301 Marcliffe Court, Waxhaw, Union County, North Carolina.  The mansion had a 2023 tax value of $1,989,300.00.

60.    Garth, through G and W Industrial Properties, LLC, also owned several homes on the North Carolina coast:

a.    1334 Guardians Gate Way, Wilmington, NC. Garth's son, Christian Brandt McGillewie, lives here.  He was 24 years old in 2023.

b.    319 W. First Street, Ocean Isle Beach, NC

c.    27 Cumberland St, Ocean Isle Beach, NC

d.    801 Ocean Isle Beach Rd SW, Ocean Isle Beach, NC.

61.    Garth used the proceeds to fund an extravagant lifestyle for himself and his family.  He used the money AMR received for daily living expenses, numerous luxury vehicles, boats, beach houses, jewelry, expensive vacations, private jet travel, a plane, NFL tickets, and an all-around luxury lifestyle.

62.    Garth also used the proceeds to enrich his friends, Matthew "Scott" Diggs and Paul Adkison.  Diggs and Adkinson were members of several LLCs whose corporate names include the phrase "Lift-It."  Garth, through AMR, transferred over $71 million to the "Lift-It" entities, with millions of those funds going to Diggs and Adkison.

63.    Diggs and Adkison, along with all the "Lift-It" entities and other parties, are defendants in a civil action filed on June 13, 2025 by First National Bank of Pennsylvania ("FNB") in the United States District Court for the Western District of North Carolina, Case Number 3:25-cv-00410.  This Complaint alleges causes of action for Fraudulent Misrepresentations, Fraudulent Concealment, Negligent Misrepresentation, Violation of Racketeering Influenced and Corrupt Organizations Act (18 USC § 1961 *et seq.*), Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act (18 USC § 1962(d)), Breach of Contract, Breach of Contract (Piercing the Protective Veil), Breach of Guaranty, Aiding and Abetting

Fraud, Conspiracy to Commit Fraud, Fraudulence Conveyance (Actual Fraud), and Fraudulent Conveyance (Constructive Fraud).

64.    The Lift-It entities were supposed to own – and represented to FNB that they used FNB loan proceeds to purchase and own -- the same telehandlers that Garth purportedly was selling, leasing, re-selling, and doing lease-buybacks with through AMR.

65.    Diggs and Adkison, through the Lift-It entities, represented to FNB that it owned hundreds of telehandlers purchased from AMR. This representation was materially false and made with either fraudulent intent or reckless indifference for the truth. Upon information and belief, they actually owned few--if any--of the telehandlers reported on their balance sheet. Indeed, many of the serial numbers for machines they represented they owned were fake or were for machines owned or encumbered by other parties.

66.    Garth's criminal behavior masqueraded the fact that AMR's liabilities far exceeded its assets for at least four years before the Petition Date, perhaps since inception.

67.    For at least four years before the Petition Date, AMR lacked revenue from legitimate business activities to pay its creditors.

68.    Garth commingled the funds AMR received from creditors and investors.

### **Centerpoint and Perialas**

69.    In 2021, AMR hired Centerpoint and Perialas to provide fractional CFO services, including performance of or assistance with general accounting, financial analysis, financial reporting, month end close process, audit, debt financing, and business operation assistance.

70.    Perialas represented to lenders that he was the CFO of the Debtor. AMR had no in-house CFO while Perialas served in this role, only a succession of accountants and bookkeepers.

71.    AMR paid CenterPoint and Perialas over $123,000 between 2021-

2023 for these services.

72.     As AMR's CFO, Centerpoint and Perialas had access to and reviewed the books and records of AMR.

73.     As AMR's CFO, Centerpoint and Perialas had access to and communicated extensively with employees of Burkett, Burkett & Burkett, Certified Public Accountants ("Burkett"), the debtor's outside CPA firm.

74.     Centerpoint and Perialas had access to the books and records of Burkett related to the AMR.

75.     Centerpoint and Perialas's employees also had access to AMR's employees, including Garth, King, and Stephanie Hofinga, a Senior Accountant for AMR.

76.     While Centerpoint and Perialas served as AMR's CFO, Garth, as the member-manager responsible for managing AMR, engaged in a pattern of fraud, waste, abuse, insider loans, improper financial disbursements, and kept the AMR Ponzi Scheme operating.

77.     While CenterPoint and Perialas served as AMR's CFO, CenterPoint and Perialas had knowledge and awareness of multiple red flags, accounting irregularities, and other improper behavior by Garth where he was effectively running the AMR Ponzi Scheme and looting AMR of tens of millions of dollars to enrich himself, his family, and his friends.

78.     For example, in 2022 Kim Smith, a certified public accountant at Burkett, discovered Garth's "buyback" scheme in which the Debtor purported to sell telehandlers to customers then buy them back shortly thereafter and pay the customer 10%.  Smith expressed skepticism of this practice because it made no business sense and the Debtor lost money on every transaction.  This information was shared with Centerpoint and Perialas.

79.     Centerpoint and Perialas also discovered massive amounts of funds going to Garth personally that were categorized as personal distributions on the Debtor's books.

13

80.    Centerpoint and Perialas also discovered that Garth had a separate portfolio of "friends" that he did business with and that lacked adequate documentation to account for them properly on the Debtor's books.

81.    Centerpoint and Perialas also were aware of a consistent and pervasive pattern in which critical financial information of the Debtor was maintained exclusively by Garth, which he refused to share with the Debtor's accountant or Centerpoint and Perialas.

82.    Centerpoint and Perialas were also aware that Garth had sole access the Debtor's bank accounts and engaged in rampant transfers of funds between the accounts.

83.    Centerpoint and Perialas were also aware of significant discrepancies as to the actual inventory of Merlo equipment purchased by Debtor, owned by Debtor, sold by Debtor, and leased by Debtor.

84.    Centerpoint and Perialas were also aware of Garth's lavish lifestyle, an additional red flag.

85.    Centerpoint and Perialas had multiple communications with Woodforest Bank, AMR's lead lender, and failed to disclose all the red flags of which they were aware.

86.    In August 2022, Centerpoint and Perialas assisted Garth in entering into a Letter Agreement with TerraNova Capital Equities, Inc. ("TerraNova") to memorialize Debtor's engagement of TerraNova "as its exclusive debt agent to arrange a potential structured finance facility ("Facility")" for Debtor. The Facility was "anticipated to aggregate up to $40 Million but may exceed that amount."

87.    With the financial information provided by and the representations of Centerpoint and Perialas, TerraNova arranged two facilities: a $4 million loan facility with NFS Leasing ("NFS") on July 26, 2022 ("NFS Facility") and a $4.9 million lease facility with Varilease Finance Inc. ("VFI") ("VFI Facility").

88.    The NFS Facility and VFI Facility are referred to as the "Facilities."

89.    On July 18, 2022, NFS wired $3,833,935.31 to Debtor's SouthState bank account -2737.

90.    On August 11, 2022, VFI wired $4,757,821.43 to Debtor's SouthState bank account -2737.

91.    Garth immediately diverted the lion's share of the funds to individuals and entities that the Trustee contends were part of the "friends and family" group that participated in the AMR Ponzi Scheme. They included: Brian Smith, Con-Ag-Tech, LLC, WJM Investments, LLC, Western Montana Land and Cattle Co., Pure Profit, LLC, Garth McGillewie Sr., Lift-It Holdings, Galena Equipment Rentals dba Bigge Crane and Rigging Company.

92.    Garth also diverted the funds for personal, non-debtor expenses with N935JC, LLC (plane), Charles Fox Homes, LTD, Intracoastal Angler, Atlantic Marine Electronics, Inc., Weaver Boat Works, and money to a relative Gabriella Carpenter.

93.    AMR defaulted on the NFS Facility within a few months. NFS filed Proof of Claim 35-1 in this case in an amount exceeding $4.4 million.

94.    The NFS Facility was supposed to be secured by numerous Merlo Telehandlers, but NFS has been unable to find or recover all of its purportedly-pledged collateral.

95.    VFI entered into a Master Lease Agreement with Defendant on July 15, 2022. AMR defaulted on the VFI Facility within a few months. VFI filed Proof of Claim 41-1 in this case in an amount exceeding $7.7 million.

96.    Under the VFI Facility, funds were supposed to be used to purchase numerous Merlo Telehandlers, which would be owned by VFI and leased to Debtor, but VFI has been unable to find or recover all of its purportedly-pledged collateral.

97.    By the time of the Letter Agreement in April 2022, Defendant was hopelessly insolvent and merely a front for Garth's massive fraud and a vehicle to perpetuate the AMR Ponzi Scheme.  Centerpoint and Perialas knew or should have been aware of the financial situation at AMR.

98.    In 2023, Centerpoint and Perialas assisted Garth in attempting to get debt financing through Great Rock Capital Partners.  Despite knowledge of the above red flags, Perialas did not disclose them to Great Rock and did not provide complete, candid, and accurate information to Great Rock.

99.    As late as April 2023, Perialas provided documents, spreadsheets, and financial statements and projections to Alliance Management, a boutique restructuring and M&A advisory firm, on behalf of Garth and AMR.  This information was not complete, candid, or accurate and, in fact, Alliance "noted some issues with it that could be problematic."

100.    Woodforest Bank had AMR put into state-court receivership before things went anywhere with Alliance.

101.    Centerpoint and Perialas breached their professional obligations to AMR and aided and abetted Garth's fraud and breach of fiduciary duties, by failing to provide King, as Vice President, any notice of Garth's illicit actions, when Centerpoint and Perialas knew King relied on both Garth and CenterPoint and Perialas to ensure that AMR's books and records were properly maintained.

102.    Centerpoint and Perialas ignored the obvious fraudulent conduct and failed to share the information with King or other employees so they could act in the best interests of AMR.

103.    Centerpoint's and Perialas's failure in its duty to inform King permitted Garth to steal millions from AMR.

104.    As a result of Centerpoint's and Perialas's actions and inactions, Plaintiff brings this action.

105.    The terms of Centerpoint's and Perialas's services as CFO were embodied by one or more engagement letters that set forth the terms and conditions

of Centerpoint's and Perialas's services and the parties' respective obligations.

106.   Centerpoint and Perialas had an obligation to identify transfers of funds outside of the normal course of business and evaluate whether the business purpose for significant unusual transactions indicated that the transactions may have been entered into to engage in fraud.

107.   Centerpoint and Perialas had an obligation to identify Garth's fraudulent conduct and bring it to the attention of an appropriate level of management, the Debtor's lenders, and the appropriate authorities.

108.   Centerpoint and Perialas failed to satisfy these obligations to the Debtor.

109.   Garth's massive fraud should have been obvious to Centerpoint and Perialas and would have been obvious to any CFO exercising the appropriate standard of care under these circumstances.

110.   AMR retained Centerpoint and Perialas to perform CFO services in an effort to ensure that AMR operated properly, its finances handled prudently, its income and expenses properly booked, and that AMR remained in compliance with all contractual obligations and applicable laws and regulations.

111.   Upon information and belief, although Centerpoint and Perialas were not providing AMR with any opinion regarding its financial statements, as set forth above, they were obligated to perform CFO services in good faith and in service to AMR, not Garth.

112.   Further, upon information and belief, Centerpoint and Perialas knew that while King did not review AMR's financial statements, she was relying on Garth and Centerpoint and Perialas to prepare AMR's books and records and ensure that AMR's finances were competently managed.

113.   Centerpoint and Perialas never sought King's approval or notified King or any other employee about any of the red flags and inappropriate behavior by Garth.

114.   Centerpoint and Perialas never sought nor obtained King's input or approval for any of the accounting practices that hid the nature and extent of Garth's fraud. Instead, and contrary to Centerpoint's and Perialas's obligations as AMR's CFO, CenterPoint and Perialas kept King in the dark about AMR's finances.

115.   As set forth above, Garth's fraudulent actions resulted in AMR's ultimate bankruptcy and over $200 million in creditor claims.

116.   Had Centerpoint and Perialas performed their CFO services in accordance with their contractual requirements, fiduciary duty, and due standards of professional care, CenterPoint and Perialas would have identified the fraud and reported it to King, other employees, AMR's lenders, and other appropriate authorities.

117.   Further, as set forth above not only did CenterPoint and Perialas breach their professional obligations but, through their inaction, they also aided and abetted Garth's fraud.

118.   As such, Plaintiffs have been injured as a direct and proximate cause of CenterPoint's and Perialas's conduct in an amount to be specifically established at trial, but not less than $200 million.

## CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
#### (Negligence)

100.   Plaintiff incorporates by reference all previous allegations.

101.   At all relevant times, Centerpoint and Perialas owed the Debtor a duty to exercise the degree of care, skill, and diligence commonly possessed and exercised by CFOs under similar circumstances.

102.   Centerpoint and Perialas breached this duty by, among other things: (a) Failing to detect clear signs of Garth's fraud and the AMR Ponzi Scheme; (b) Failing to properly investigate suspicious transactions and accounting irregularities; (c) Failing to maintain professional skepticism in the face of red flags indicating potential fraud; (d) Failing to properly advise the Debtor regarding internal control deficiencies; (e) Failing to report Garth's misconduct to appropriate

18

officers, lenders, or authorities; and (f) Failing to resign the engagement when Centerpoint and Perialas knew or should have known that their services were being used to facilitate wrongdoing.

103.    As a direct and proximate result of Centerpoint's and Perialas's negligence, the Plaintiff has sustained damages in an amount to be determined at trial but believed to exceed $200 million dollars.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

104.    Plaintiff incorporates by reference all previous allegations.

105.    Debtor and Centerpoint and Perialas entered into an engagement agreement whereby Centerpoint and Perialas agreed to provide professional CFO services to the Debtor in exchange for compensation.

106.    The engagement agreement, both expressly and impliedly, required CenterPoint and Perialas to perform their services with reasonable care and in accordance with applicable professional standards.

107.    Centerpoint and Perialas materially breached the engagement agreement by failing to perform their services with reasonable care and in accordance with applicable professional standards.

108.    As a direct and proximate result of Centerpoint's and Perialas's breach of contract, the Plaintiff has sustained damages in an amount to be determined at trial but believed to exceed $200 million dollars.

## THIRD CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty)

109.    Plaintiff incorporates by reference all previous allegations.

110.    At all relevant times, Garth owed fiduciary duties to the Debtor, including duties of loyalty, care, and good faith.

111.    Garth breached these fiduciary duties by looting the Debtor, using it to perpetrate a massive fraud and the AMR Ponzi Scheme, and misappropriating corporate assets for personal use and benefit.

112.    Upon information and belief, Centerpoint and Perialas knew or should have known of Garth's breaches of fiduciary duty based on the financial information available to them.

113.    Despite this knowledge, Centerpoint and Perialas by their inaction provided substantial assistance to Garth by failing to report the misconduct and by continuing to provide CFO services that facilitated or concealed Garth's wrongdoing.

114.    Despite Centerpoint's and Perialas's knowledge of Garth's self-dealing, breach of fiduciary duties, and rampant fraud, CenterPoint and Perialas consciously avoided taking any action or implementing any procedure that would have revealed Garth's massive fraud to Plaintiff, its officers, lenders, or appropriate authorities.

115.    As a direct and proximate result of Centerpoint's and Perialas's aiding and abetting Garth's breaches of fiduciary duty, the Plaintiff has sustained damages in an amount to be determined at trial but believed to exceed $200 million dollars.

## FOURTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

116.    Plaintiff incorporates by reference all previous allegations.

117.    In the course of their engagement, Centerpoint and Perialas prepared or assisted in the preparation of financial statements and other financial information for the Debtor that materially misrepresented the Debtor's true financial condition by failing to properly account for Garth's misappropriation of corporate assets.

118.    The Debtor then provided this tainted and inaccurate information to lenders and potential lenders to solicit new and continuing funding for the Debtor so Garth could perpetuate the AMR Ponzi Schme.

119.    Centerpoint and Perialas knew that this financial information would be relied upon by the Debtor, its officers, and creditors.

120.   The Debtor, its lenders, and others reasonably relied on the accuracy of the financial information to their detriment.

121.   As a direct and proximate result of Centerpoint's and Perialas's negligent misrepresentations, the Plaintiff has sustained damages in an amount to be determined at trial but believed to exceed $200 million dollars.

## FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

122.   Plaintiff incorporates by reference all previous allegations.

123.   By virtue of Centerpoint's and Perialas's role as the Debtor's CFO and the special relationship of trust and confidence that existed between CenterPoint and Perialas and the Debtor, CenterPoint and Perialas owed fiduciary duties to the Debtor.

124.   Centerpoint and Perialas breached these fiduciary duties by, among other things: (a) Failing to act in the Debtor's best interests; (b) Failing to disclose material information regarding Garth's misconduct; (c) Placing its own interest in maintaining the client relationship ahead of the Debtor's interests; (d) failing to exercise oversight over the internal controls of AMR; (e ) failing to put precautions in place that would have prevented Garth from engaging in fraudulent conduct; (f) Failing to exercise independent judgment and professional skepticism; (g) acting in a manner to suggest complicity with Garth's conduct; and (h) all other actions and inactions described above.

125.   As alleged, Centerpoint and Perialas failed to use that degree of skill and learning normally possessed and used by CFOs in good standing in a similar practice and under like circumstances.

126.   As a direct and proximate result of Centerpoint's and Perialas's breaches of fiduciary duty, the Plaintiff has sustained damages in an amount to be determined at trial but believed to exceed $200 million dollars.

## SIXTH CLAIM FOR RELIEF
### (Fraudulent Transfer - 11 U.S.C. § 548, 550)

127.   Plaintiff incorporates by reference all previous allegations.

128.   During the two-year period prior to the petition date, the Debtor paid CenterPoint and Perialas fees for CFO services totaling approximately $121,000.00.

129.   The Debtor received less than reasonably equivalent value in exchange for these payments because the services provided by CenterPoint and Perialas were deficient and failed to meet applicable professional standards.

130.   These transfers were made while the Debtor was insolvent or became insolvent as a result of the transfers.

131.   Pursuant to 11 U.S.C. § 548, the Trustee is entitled to avoid these transfers and recover from Centerpoint and Perialas the full amount of such transfers.

## SEVENTH CLAIM FOR RELIEF
### (Avoidance of Preferential Transfers - 11 U.S.C. § 547)

132.   Plaintiff incorporates by reference all previous allegations.

133.   Defendants are insiders of the Debtor under Section 101(31) of the Bankruptcy Code.

134.   From August 10, 2022 to the Petition Date, AMR paid at least $93,100.00 to Defendants ("Preference Period Transfers").

135.   The Preference Period Transfers represent transfers of property of the Debtor to the Defendants.

136.   The Preference Period Transfers were made to or for the benefit of the Defendants as a creditor.

137.   The Preference Period Transfers were made on account of an antecedent debt owed by the Debtors before such transfers were made.

138.   The Preference Period Transfers were made while the Debtor was insolvent.

139.    The Preference Period Transfers were made within the lookback period of Section 547.

140.    Defendants received more from the Preference Period Transfers than it would receive in this Chapter 7 case had it not received the Preference Period Transfers.

141.    For these reasons, the Preference Period Transfers should be avoided.

142.    Defendants were the initial transferee of the Preference Period Transfers.

143.    Plaintiff is entitled to recover the Preference Period Transfers or their value from the Defendants under Section 550.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants Centerpoint and Perialas, as follows:

1.    That on its First Claim for Relief, the Court enter  judgment against Defendants, jointly and severally, awarding damages to Plaintiff in an amount to be proven at trial;

2.    That on its Second Claim for Relief, Plaintiff have and recover judgment against Defendants, jointly and severally, awarding damages to Plaintiff in an amount to be proven at trial;

3.    That on its Third Claim for Relief, Plaintiff have and recover judgment against Defendants, jointly and severally, awarding damages to Plaintiff in an amount to be proven at trial;

4.    That on its Fourth Claim for Relief, Plaintiff have and recover judgment against Defendants, jointly and severally, awarding damages to Plaintiff in an amount to be proven at trial;

5.    That on its Fifth Claim for Relief, Plaintiff have and recover judgment against Defendants, jointly and severally, awarding damages to Plaintiff in an amount to be proven at trial;

6.      That on its Sixth Claim for Relief, the Court avoid the Transfer and Plaintiff recover the full value of the Transfers from Defendants;

7.      That on its Seventh Claim for Relief, the Court avoid the Preference Period Transfers and Plaintiff recover the full value of the Transfers from Defendants;

8.      That the Court grant the Plaintiff such other and further relief as the Court deems just and proper.

This the 25th day of September, 2025.

/s/ Lance P. Martin
Michael J. Parrish
N.C. State Bar I.D. No.: 38419
email: docketCR@wardandsmith.com
email: mjp@wardandsmith.com
Lance P. Martin
N.C. State Bar No. 027287
email: docketCR@wardandsmith.com
email: lpm@wardandsmith.com
Ward and Smith, P.A.
Post Office Box 2020
Asheville, NC 28802-2020
Telephone: 828.348.6070
Facsimile: 828.348.6077
*Counsel for Cole Hayes, Esq., Trustee*
  *for Applied Machinery Rentals, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that the foregoing FIRST AMENDED COMPLAINT was filed electronically in accordance with the local rules and was served electronically on those entities that have properly registered for such electronic service. Entities not registered for electronic service have been served by depositing a copy thereof in the United States mail, postage pre-paid:

David L. Levy, Esq.
Jon P. Carroll, Esq.
Gardner Skelton, PLLC
3746 N. Davidson Street
Charlotte, NC 28205
*Counsels for Paul Perialas*
*Served via CM/ECF*

Gateway Accounting, Inc.
dba Centerpoint CFO
c/o Gary E. Applegate, its Registered Agent
153 Coronilla Road
Mooresville, NC 28117

Centerpoint CFO, LLC
c/o Gary E. Applegate, its Registered Agent
153 Coronilla Road
Mooresville, NC 28117

This the 25th day of September, 2025.

*/s/ Lance P. Martin*
Michael J. Parrish
N.C. State Bar I.D. No.: 38419
email: docketCR@wardandsmith.com
email: mjp@wardandsmith.com
Lance P. Martin
N.C. State Bar No. 027287
email: docketCR@wardandsmith.com
email: lpm@wardandsmith.com
Ward and Smith, P.A.
Post Office Box 2020
Asheville, NC 28802-2020
Telephone: 828.348.6070
Facsimile: 828.348.6077
*Special Counsel for Cole Hayes, Esq., Trustee*
*  for Applied Machinery Rentals, LLC*